Filed 2/27/24  In re D.H. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re D.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.H. et al., <br><br> Defendants and Appellants. | G062999 <br><br> (Super. Ct. Nos. 21DP0975, 21DP0976 & 21DP0977) <br><br> O P I N I O N |

Appeals from an order of the Superior Court of Orange County, Julie Swain, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Respondent Father.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

## INTRODUCTION

D.H. (Mother) and D.W. (Father) appeal from an order from the juvenile court terminating their parental rights to D.H.1 (age 6), D.H.2 (age 3), and D.H.3 (age 1)[1]. The court chose a permanent plan of adoption with the children's foster parents, finding the statutory parental benefit exception under Welfare and Institutions Code[2] section 366.26, subdivision (c)(1)(B)(i) did not apply. Under this exception, the juvenile court is not required to terminate parental rights to an adoptable child if it finds: "a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Our Supreme Court has supplied a three-element test for courts to use in applying this exception: "(1) regular *visitation and contact*, (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

Appellants contend the juvenile court abused its discretion in finding against them on the third element of the *Caden C.* test because it improperly considered their continued struggles with substance abuse and their ability to occupy a parental role with the children. Father also contends the court failed to consider a bonding study which found each of the children had some degree of an attachment bond to one or both of their biological parents, and ignored evidence that the primary social worker assigned

---

[1] We give the children's ages as of the time of the appealed order.

[2] All further statutory references are to the Welfare and Institutions Code.

to the case had given incomplete information in her reports about D.H.1's bond with her parents and positive interactions during visits.

We affirm. The juvenile court clearly did agree with the bonding study to some extent, but ultimately found the benefit to the children from continuing the relationship with Father and Mother did not outweigh the permanence of a loving, stable adoptive home.

## FACTS

Mother and Father struggle with substance abuse and mental health issues, and when Mother gave birth to D.H.3 by emergency cesarean section in August 2021, a report was made to Orange County Social Services Agency (SSA). Mother was admitted to the hospital prior to the birth with decompensated heart failure, testing positive for methamphetamine. The baby was born at 33 weeks, weighing only five pounds, and had poor respiratory effort. He was placed in the neonatal intensive care unit with a CPAP (continuous positive airway pressure), intravenous line, and feeding tube. Mother admitted she had used methamphetamine throughout the pregnancy along with marijuana, and received no prenatal care.[3] She has medical problems, including fibromyalgia, anxiety, and depression. Her conditions cause her pain and she said she took these substances rather than pain medication to help her get out of bed. However, she was only aware she was pregnant for about a month and a half.

Father also used methamphetamine and marijuana. He claimed he used meth about once a month, and he and Mother had used a week prior to D.H.3's birth, although not together.

At SSA's request, the juvenile court issued a protective custody warrant on August 31, 2021. The girls, at this point aged 4 and 1, were removed from the parents' home and placed at an emergency shelter home with a resource family while D.H.3

---

[3] A report had also been made to SSA at the birth of D.H.2 in 2020, because Mother tested positive for marijuana at that time even though her obstetrician had advised her not to use it.

remained in the hospital. On September 7, 2021, the juvenile court ordered the children detained and allowed the parents eight hours of supervised visitation per week. It set a jurisdictional hearing for October 20, 2021. The court authorized random drug and alcohol testing.

September and October 2021

SSA filed its jurisdictional/disposition report on October 6, 2021. D.H.3 remained in the hospital, but the social worker was able to interview D.H.1. D.H.1 showed a marked affinity for her paternal grandfather, whom she called "Papa." She and her parents had lived with the grandfather, and she remarked that her parents could be "mean," "smacking" and pushing her. The social worker was unable to schedule a pretrial interview with either of the parents because they canceled five previously scheduled meetings to do the interview. However, in an interview on September 2, Father had reported the paternal grandfather kicked him and Mother out of the home after the children were taken into custody. The couple was living in motels and couch-surfing. Father had been in the foster system as a child and did not want the same for his children.

SSA recommended both parents be offered the following services: random drug testing, substance abuse treatment, self-help meetings, parenting education, and general counseling. However, as of the time the report was filed, neither of them had appeared for drug tests.

The parents had a few visits with the girls during this period, canceling four other visits with them. They would call the girls sporadically during the week. Mother had one visit on her own with the girls. The visits were positive. However, the parents never visited D.H.3 in the hospital, even though they were allowed to do so. On October 9, D.H.3 was placed in a separate emergency shelter home from his sisters.

At the October 20 jurisdictional hearing, the children were declared dependents and the matter was placed on the 15-day review calendar because SSA had not yet been able to locate a long-term foster placement for all three siblings together.

4

<u>November 2021 to March 2022</u>

On November 27, 2021, SSA finally was able to place the three siblings in a suitable foster home with Ashley and Kenneth L., who lived in San Bernardino County but were willing to transport the kids to Orange County for visits with their parents. The juvenile court set a six-month review hearing for April 12, 2022.

On March 29, 2022, SSA filed its status review report in preparation for the April hearing and recommended the court terminate reunification services to Mother and Father. The agency did not know their whereabouts, though they were believed to be residing in a tent in the paternal grandfather's backyard. They had not made much progress on their court-ordered services during the reporting period. Both completed a parenting education class, but they had done no drug tests, and had not enrolled in substance abuse treatment, counseling, or a 12-step program.

Meanwhile, the children were doing well in Ashley and Kenneth's care. D.H.2 and D.H.3 were making developmental strides, and enjoyed their new home. D.H.3 had put on eight pounds since his birth and received all his immunizations. He was cooing, smiling, making eye contact, holding his head up, and grasping his bottle. D.H.1 started transitional kindergarten and was enjoying it and making friends. SSA viewed all three children as adoptable, and Kenneth and Ashley as responsible, loving foster parents who were interested in adopting them if reunification efforts failed.

Mother and Father had only asked for four hours of their permitted eight hours of supervised visitation per week. They failed to show up for eight visits throughout the reporting period, and while they did have some positive interactions, they also exhibited some concerning behaviors at many of these visits. At one visit, supervised by a social worker, Father went to the bathroom and returned smelling of marijuana. At another visit, supervised by the caregivers, both parents were acting odd. Father was wearing soiled clothing and acting erratic and jumpy while Mother appeared flushed, breathless, and dizzy. The parents' somewhat lengthy bathroom breaks were a

constant during visits, and neither parent engaged that much with the baby or brought him any supplies. Father was also heard swearing at D.H.1 on more than one occasion. Some visits ended early because the mother was weak and tired, and the parents were often observed with red eyes and beads of perspiration on their foreheads.

April 2022 to September 2022

The six-month review hearing was continued four times due to counsel and court availability and other administrative issues. During the April to September 2022 time period, SSA filed three addendum reports to give the status of services and visitation.

*Addendum Report No. 1 – May 13, 2022*

This report stated both parents were no-shows for drug tests on six occasions, all of which counted as positive tests. Mother tested positive for cannabinoid, carboxy THC, opiate, hydrocodone, and hydromorphone on May 6 and resisted getting the drug patch. Father tested positive for cannabinoid, opiates, hydrocodone, and hydromorphone on May 2 and May 4. Neither parent ever gave a negative drug test during this reporting period.

As for services, Mother failed to appear for an intake appointment for outpatient substance abuse treatment, and had not enrolled in counseling. Father had not done his counseling or treatment either, and missed his intake appointment as well.

The parents were still only using four hours of their eight ordered hours of supervised visitation per week. The paternal grandfather was also visiting the children once per week. While the weekly visits consisted of two hours on Monday and Wednesday afternoons, the parents were still showing concerning behaviors. Father often was observed to be sweating and tired looking. Mother too was often weak or dizzy, and had bloodshot eyes. There was little positive interaction with the children, and some visits ended early. The caregivers noticed that D.H.1 was more sensitive than usual after the April 11 visit, and D.H.2 rocked herself back and forth afterward. On April 25,

6

the caregivers made a child abuse report because Father had told them that he spanked the children in the past as a form of discipline. There was little engagement with the baby. The social worker noted in her report that both she and the caregivers had "observed the parents having difficulty demonstrating appropriate or positive interactions with the children during some of the supervised visits."

*Addendum Report No. 2 – July 5, 2022*

Mother and Father's substance abuse persisted into the summer of 2022. Both were no-shows for three drug tests, although both tested negative for drugs on one test each – Mother tested negative on June 3, and Father tested negative on May 17. However, both still tested positive several times. Father was positive for cannabinoid, opiate, hydrocodone, hydromorphone, and carboxy THC on May 24 and June 8. Mother tested positive for cannabinoid and carboxy THC four times and positive for the same along with opiate, hydrocodone, and hydromorphone on May 23, May 26, and June 13. Both parents reported they were attending virtual Narcotics Anonymous classes but did not provide attendance verifications. And they had not enrolled in counseling or outpatient substance abuse treatment.

They continued to do four of their eight hours of weekly supervised visitation into May and June. They were observed sweating, tired, and with red eyes at multiple visits. There was little interaction with D.H.3, and the caregiver would often have to attend to him. D.H.2 had a penchant for running off and the caregiver would have to step in and chase her when Mother and Father weren't paying attention. At the May 23 visit, Mother was lethargic with droopy eyes, and was slurring her words. She could not remember D.H.2's name on one occasion. Between them, the parents took six bathroom breaks and would pass a clothes bag back and forth between them. Father was also very rough with D.H.1 on one occasion when she took an extra piece of cake, and the incident seemed to leave her shaken. He also refused to put D.H.2 down once during the June 1 visit and told her to stop crying when she became upset. She pointed at

7

Ashley and said "mommy," running to her when Father finally put her down. D.H.1 would often play alone or with other kids at the park rather than with her parents.

*Addendum Report No. 3 – August 25, 2022*

During this reporting period, Mother and Father showed some improvement. They verified their attendance at Narcotics Anonymous meetings and both did their intake appointments for substance abuse treatment. Mother supplied a note from her doctor stating that she was prescribed cannabis for her medical condition. However, the couple was still erratic in their drug testing. They were each no-shows three times, and were positive for the same substances on numerous occasions. Father was consistently testing positive for marijuana throughout late June through early August.

Visitation continued to be only four hours per week, and the interactions were still a bit bumpy. The parents brought toys for the kids to play with on several visits, as well as some food. D.H.2 and D.H.1 were excited to see their parents. And the parents also engaged a lot more with the baby. However, they were observed to be sweating with droopy eyes several times. And during the August 3 visit, D.H.2 ran into the street while playing with Mother. The caregiver had to scream at the child to stop before she stepped into the path of a vehicle. Even after this occurred, D.H.2 was able to get toward the street when Father and Mother were not paying attention. The caregiver had to keep an eye on her and stop her before she got too close.

When the review hearing was finally held on September 13, 2022, more than a year after the children had been detained, the court adopted SSA's recommendation. It terminated reunification services for Father and Mother, and set a selection and implementation hearing under section 366.26 for January 11, 2023. SSA and the parents entered into a "soft .26" agreement by which they could continue to get services until the hearing.

October 2022 to May 2023

Father and Mother began using all eight hours of their weekly visitation in October 2022. By the time SSA filed its report on December 27, 2022 in preparation for the selection and implementation hearing, Mother and Father were consistently using their visitation and were on time. However, an unfortunate incident occurred during the November 7, 2022 visit at a McDonalds restaurant. Father was holding the baby, and the caregiver noticed he was yelling at D.H.1, though there was a wall preventing her from seeing exactly was going on. Father walked out of the restaurant, and D.H.1 went over to Mother and told her Father had hit her and left a mark. A red mark was visible on the child's arm. Mother confronted Father about hitting D.H.1, gesturing to the caregiver and whispering, "you cannot hit her." The caregiver called into the foster agency to find out what to do and was told to end the visit. When Father was told the visit was ending, he began yelling and escalating the situation, blaming D.H.1 for having to end the visit early: "You have to leave early because you're a fucking liar [D.H.1], I didn't hit you. You're a fucking liar! This is all your fault." By this point, the baby was also crying. The social worker called in a child abuse report based on this incident. Father denied slapping D.H.1, but D.H.1 said the incident did occur. She said she had grabbed her little brother's wrist even though Father had already told her not to. She felt sad that she had forgotten and grabbed his wrist again.

At the November 19, 2022 visit, Father accosted Ashley for needing to take a bathroom break during the visit because she was supposedly "robb[ing him]" of time with his kids.

By the end of 2022, the children were well-bonded to their foster parents, and referred to them as mom and dad. D.H.1 wanted to remain with Ashley and Kenneth, but also wanted to be with her parents. SSA recommended that parental rights be terminated and adoption be approved as the children's permanent plan.

9

The court continued the selection and implementation hearing to February 27 because it was otherwise engaged. This date was then continued multiple other times to May 24.

On February 28, 2023, the court granted the parents' ex parte request to have a bonding study done by Dr. Jessica L. Borelli. Dr. Borelli observed two visits on March 4 and March 11. During the first visit, Ashley, Kenneth, and Father's father were present, which led Dr. Borelli to ask that the three not attend the second visit so she could better observe the contact between the children and their biological parents. She concluded D.H.1 had an attachment bond to both her parents, but particularly her mother, and that there was "promise present" in the relationship which "could develop into a deeper relationship" with continued contact. Dr. Borelli thought D.H.2 was attached to both parents. She showed a desire for physical contact with her parents, shared information with them, and relied on them for needs. D.H.3, however, only seemed to have an attachment bond with Father, with the evidence being less strong as to Mother. Dr. Borelli recommended ongoing contact between the parents and children, and the removal of technology which might distract from the visits.

Between January and February 2023, both Father and Mother were still testing positive for substances frequently. Father was in outpatient treatment, but his counselor said he continued to test positive during random drug testing at the facility. He told Father the program would not work if he was testing positive. Father indicated he had stopped using. February 9 was the first time Father tested negative for substances.

On March 13, the trial court granted Ashley and Kenneth's request to be given de facto parent status. Father and Mother continued with their eight hours of visitation, and were having more positive, active interaction with the kids. The social worker dropped into the February 18 visit unannounced and saw the parents engaged and playing with the children at a McDonalds. They were also testing negative more often

10

than not through late February into April 2023. However, they were not consistently attending their drug treatment program.

When the selection and implementation hearing was finally held, the court took testimony from two of the social workers on the case, as well as from D.H.1. D.H.1 said she enjoyed her visits with Father and Mother, and that she did not want a brand new mom and dad. She did not want to be adopted by Ashley and Kenneth, but she also referred to them as Mom and Dad in her testimony.

On August 8, 2023, the court ordered parental rights terminated and the children placed for adoption together. The court explicitly stated it did not view Father's and Mother's personal struggles as a reason to terminate their parental rights. And it did take into account Dr. Borelli's recommendations and D.H.1's wishes. The court found there was a beneficial relationship between D.H.1 and her parents, and that Father and Mother had regularly and consistently visited the children. However, the relationship "does not resemble a consistent, daily nurturing found in the positive stable relationship that parents could provide." It was more of a friendly relationship, and the stability of a permanent home would outweigh any detriment coming from terminating the relationship with her parents. As such, Father and Mother had not met their burden to show the parental benefit exception applied.

## DISCUSSION

By the time a selection and implementation hearing is set under section 366.26, the juvenile court has already determined the dependent children cannot be safely returned to their parents. At this hearing, "the question before the court is decidedly not whether the parent may resume custody of the child[,]" but rather the arrangement which would give the child stability and permanence. (See *Caden C.*, *supra*, 11 Cal.5th at p. 630.) The preferred plan for these children is adoption. (See § 366.26, subd. (b)(1).) "Thus, at the section 366.26 hearing, 'in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor

11

will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. . . . "[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted." [Citation.]' (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.) [¶] . . . [i]f the court makes the two aforesaid determinations, it is required to terminate parental rights to allow for adoption of the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) But a parent may avoid this result if he or she establishes 'that the termination of parental rights would be detrimental to the child due to one or more of . . . [six statutory] circumstances.' (§ 366.26, subd. (c)(1)(B).)" (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1149-1150.)

The parental benefit exception under section 366.26, subdivision (c)(1)(B)(i) is one of these six statutory circumstances, but it is just that – an "*exception*[] to the general rule that the court must choose adoption where possible[.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) In other words, the circumstance must truly be exceptional. (*Ibid.*)

Additionally, we must remember the trial court's rejection of the parental benefit exception here hinged on the third prong of the *Caden C.* test: whether termination of the parental relationship would be detrimental to the children. The court's *factual* determinations on this prong are reviewed for substantial evidence. However, "the court must also engage in a delicate balancing of" the harm of losing the parental relationship with the benefits of a stable, permanent adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) The decision coming from this process is reviewed for abuse of discretion, which requires """"an arbitrary, capricious, or patently absurd determination."""" [Citation.]" (*Id.* at pp. 640-641.) All of this to say appellants start with an uphill battle.

We agree appellants met the first two prongs of the *Caden C.* test. To their credit, they maintained visitation and contact with the children, and the consistency, both in quality and in length of visits, improved with time. Nor can there be any question that D.H.1 in particular was bonded to her parents; her testimony clearly demonstrated this. This is to be expected, since out of the three children, D.H.1 had spent the most time with them, and with her paternal grandfather, with whom she shared an especially close bond. Dr. Borelli also found D.H.2 had an attachment bond to her parents, while D.H.3 displayed an affinity for his father. Even if the three children had different degrees of attachment to one or the other parent, the attachment was undoubtedly there.

But that leaves the trial court's analysis of the third prong. "What courts need to determine" on this prong "is how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Losing the relationship with his or her parents might predictably cause emotional upheaval to any child. However, it is also possible for "a new, stable home" to "alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

The trial court here made exactly this determination. It first found D.H.1's testimony showed her strong loving bond with her parents, and her desire for their relationship to continue.[4] But, the court went on to state correctly: "The question, then, is what is the benefit from a continued relationship with [Mother] and [Father] and whether the parents showed that terminating attachment would be detrimental when balanced against the permanent adoption home." The court balanced "the sadness, loss, and

---

[4] For this reason, any failure by SSA social workers to include examples of positive interactions in their reports, or failure to consider the bonding study in making their recommendations, was ultimately harmless. The court clearly did take all of that information into account by hearing testimony from D.H.1 herself, and by considering the bonding study independently.

13

confusion and the potential that it would create emotional challenges for [D.H.1] and the other children in the future," but concluded any such concerns were being addressed with D.H.1's therapist, and "could be addressed through being in a loving home, [and] continued support in therapy." That was a call properly reserved to the discretion of the trial court.

Mother and Father focus on one statement the court made in its ruling: "The Court notes despite the positive beneficial relationship that [D.H.1] has with her parents, and I'm referring to [D.H.1] mainly due to her age, being six, and her testimony here in court, that relationship does not resemble a consistent, daily nurturing found in the positive stable relationship that parents could provide." This statement, they say, was improper because, when doing its third prong analysis, the court is not to compare "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

The court was not making such a comparison. In fact, it went on to say as follows: "Despite [D.H.1's] testimony, the visits can be more accurately described as more than friendly, but playful and friend-like visits. . . . What she wanted were the visits that she had, and she got the best visits she could get from her parents." In saying this, the court was not comparing the parents' caregiving attributes with those of the foster parents. Rather, it was comparing the quality and nature of the visits D.H.1 had with the type of stable, nurturing relationships which would warrant making an exception to the clear legislative imperative of section 366.26: adoption. This comparison was appropriate.

Father also argues the couple's ongoing struggles with substance abuse and instability should have been irrelevant to the trial court's determination, citing *Caden C.* This argument is not persuasive. *Caden C.* explicitly allows the court to consider such factors. The *Caden C.* court held "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the [parental benefit] exception."

14

(*Caden C., supra,* 11 Cal.5th at p. 637.)  This is because a dependency matter only gets to a section 366.26 hearing when parents have been unsuccessful in addressing the problems leading to the dependency.  (*Ibid*.)  If every parent had to establish adherence to their case plan as a prerequisite for the parental benefit exception, no parent would be able to meet their burden.  But "[i]ssues such as those that led to the dependency often prove relevant to the application of the exception.  . . . A parent's struggles may mean that interaction between parent and child at least sometimes has" negative impacts on the child.  (*Ibid*.)  These struggles are therefore "relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance by losing it?"  (*Id.* at p. 638.)  It is a child-focused inquiry, not a parent-focused inquiry.

Here, the parents' continued substance abuse issues could potentially have a destabilizing impact on the children.  The May 23, 2022 visit is a prime example.  On this date, Mother tested positive for substances, and presented to the visit lethargic with slurred speech.  Father appeared disheveled, and the couple were passing a bag back and forth and spending significant time in bathroom breaks.  While the two were in this state, D.H.2 ran off unattended.  And Father appeared to overreact volcanically to D.H.1 attempting to take another piece of cake.  Visits can become destabilizing or even dangerous if the parents are under the influence, and this concern could easily have weighed on the court's mind.  We can find no basis for questioning the exercise of discretion in this difficult case.

## DISPOSITION

The order is affirmed.


                                                                      BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.